Petitioner, Mr. Barrett for the Respondent, Mr. Osborne for the Intervenor. Good morning, I'd like to reserve three minutes for a vote. May it please the Court, I am Thomas Lennons. I am representing Petitioner, Colorado Fire Sprinkler. I'm joined today by Kent Stringer and Becky Stringer who have flown here from Pueblo, Colorado for the hearing. This case is postured as a national labor relations matter involving a duty to bargain. And under construction industry rules, Section 8F relationship arguably transforming into a 9A majority based bargaining relationship. We disagree with the National Labor Relations Board finding. And frankly, the NLRB's ruling is contrary to the precedent of this court. Many times in National Labor Relations Board cases, the employer is couched as some sort of large entity trying to violate the rights of employees. This is a small business. This is a small business which has been union since its inception before it even started to hire employees because construction industry rules allow that. We're dealing with what is called a local union. It's actually a national labor entity based here on the East Coast. And we're dealing, of course, with the national federal agency, the National Labor Relations Board. So in terms of scale, my client, Colorado Fire Sprinkler, is the small player in this chemistry. The question at issue in the unfair labor practice proceedings is whether there exists a bargaining relationship between my client and the union after March 31, 2013. Now, my client signed collective bargaining agreements basically on forms that were provided by the union every single time an agreement was signed. There was no negotiation. And I think it's really important to point out that there came a point in time where negotiation was needed, at least discussion. And this court has acknowledged the importance of Section 8F in the construction industry, the unique exception it provides. And in the Nova Plumbing case, really provided a distinction between Section 8F and Section 9A relationships, which is where NLRB and the union contend we have gone. And I think what tends to be overlooked, if you look at the National Labor Relations Board's ruling and the arguments that have been made by NLRB and the union thus far, we have a complete failure to look at the rights of employees. Complete failure? I think so because... What evidence was before the board? The evidence of employees' ability to choose a labor union is vacant. In fact, we were cut off in terms... So your client signed contracts where he falsely represented that he had independently determined that the union represented a majority of employees and that the union had proffered to demonstrate this to him? My client signed form agreements proffered by the union and... So your client is a businessman and represents people, I guess, and presumably know to read contracts. My client is a construction industry contractor and... Not a contractor for a living, so presumably reads contracts. And yet, you're telling us for your argument, it's predicated on the assumption that for 15 or 20 years, he had false representations in the contracts. These were agreement forms that were presented by the union and there was no discussion of them. My client understood that in order to operate as a unionized contractor, that this form needed to be signed. There was... It's not different in substance than the form that was signed in NOVA. I don't see a material distinction, Your Honor. Well, what about the evidence that was there in the NOVA case? In the NOVA case, the issue involved a contractor which became bound to a labor agreement as a result of a trust fund lawsuit settlement. What evidence is there in this case beyond your client answering the question that the union, not to his knowledge, had ever indicated its majority status? There was no evidence at all presented in the record that the union had... So, the board said this case is just like our... King's Fire? King's Fire. Yes, the board relied on King's Fire and they relied on start and fuel, which this court rejected in NOVA Plenty. And NOVA held that the burden was on the board and the union to present... If there's no evidence and all you're left with, which is what we have here, is the contractual provision, the NOVA case held that it was incumbent upon the board and the union, the board's general counsel, and the union to present evidence of majority support. That was not done in this case. The burden was on the board under NOVA and the union to present that evidence. That's exactly right. So, if that is a correct reading of NOVA, what should have happened in this case? This case should have been dismissed in the investigation phase. So, the union would have no opportunity? The union would have had every opportunity to go to the employees and say, sign cards during the term of the agreement. No, what I'm trying to get at, in King's, the board said very clearly that it understood the burden was on the union, but that the testimony before it was insufficient to overcome the showing by the general counsel. So, the question, unlike in NOVA, where there was all this evidence that the union was, what did we say, significant evidence that the union did not represent a majority of employees. Where is the significant evidence here? There was evidence of disaffection that was presented in the hearing before the administrative law judge in the NOVA case. No, I understand that. In this case, we attempted to present evidence on the interaction between the union and the employees and recognition demands and so forth. And your counsel said, or counsel for your client said, all we want to do is make this point to the ALJ. And it went ahead and the ALJ said, fine, make that point, but I don't want to get into all this other stuff. And no objection was preserved at that point, because your client answered, not to my knowledge. And that was the end of the matter. I have a different reading of the record, Your Honor. I'm just almost quoting the record. Counsel made no objection. There was discussion on the record that we wanted to go into the majority support issue. And counsel clarified to the ALJ that he only wanted to get the answer to this question. And the ALJ said, fine. And he allowed counsel to ask Mr. Springer the question, and Mr. Springer gave his answer. There was also evidence on the record that there was no National Labor Relations Board election. We tried to go into further detail on this, but the judge was quite adamant that he did not want to go into these issues. What offer was made? There was no election. There was no election. No authorization cards. There were no authorization cards. Nobody asked about that. You don't know. That's an issue that we tried to go into, Your Honor. No. You have to put this in the record. It's not there because, as you know from the briefing in this court, when one employee tried to make some representations, the union came back and offered all this data about the employee's record. So my only point is that I'm going to raise this. The union has to have a chance to put forth a response. The union certainly had an opportunity to put forth its position and to present evidence, but the position- The issue was never joined is what I'm getting at. I'm sorry? The issue was never joined. In other words, in all these cases, Supreme Court's decision in garment workers, our case in noble plumbing, our case in M&M, our case in allied mechanical, there's record evidence before the board. There is record evidence. That Section 7 rights are in jeopardy. And, indeed, the amicus brief here cites a whole page of cases where there was some evidence to raise a question as to whether employee rights were being interfered with by the employer and the union. We don't have any of that here, do we? The record is far more silent than I would like it to be, Your Honor. And it's our position that we were cut off and we were not allowed to go into that issue. All right. So you weren't counsel before. I was counsel, Your Honor. I handled the hearing. Did you preserve your objection? Yes, I did. How? Where? I discussed it with Judge Moll. Can you point us to the record, Paige? Where? You said you only wanted to ask your client this question, and the AOJ allowed you to ask and get an answer. May I? Sure. As I look for this transcript, what I also want to point out is this case's holding in NOVA really puts the onus on the union and the board to provide proof of majority support. So what the board has said and what this court has said is there are several ways to do this. And here we have started out by saying this is a very small company. It's been unioned from its inception. Under Section 8-F. And there's nothing pointing to disaffection or abuse of Section 7 rights that's in the record. That's all I'm trying to get at. And in the fire case, the board said a mere statement by the employer given the record here, given the contract language, given what the employer had represented repeatedly in these contracts, that there was no basis to overcome the general counsel's showing. The position we're being put in is really to have some sort of burden of proof on this issue. The burden of proof is entirely with the union and the board. But what about what the board said in the fire case? It said it's not putting the burden on the employer. Not at all. The burden is on the general counsel to make its case, and then the employer has a chance to rebut that case. And saying, not to my knowledge, the board here said that's not enough.  And ladies' garment workers, as well as Nova Plumbing, in our view, supports the position that we have taken. In other words, you can have a relationship with a union for years, for decades. And by citing Nova Plumbing, that's enough. No, it's not enough, Your Honor. I think that the factual context is important. In the factual context here, the employer says, not to my knowledge. He doesn't say there are no authorization cards. He doesn't say he knows for a fact, or he even suspects. Nor did the union present any such evidence. The entire scope of the evidence is the form agreement language, which somehow- What's wrong with that when you have a pattern and the board has continuously said, and we have said, that the voluntary recognition by an employer can be sufficient? We're working in the very specific and narrow context of Section 8 out of the National Labor Relations Act for this industry. And the United States Supreme Court and ladies' garment workers, this court and Nova, have made clear that the rights of employees under Section 7 can't be taken away by someone else. Whether or not we spoke to that issue, contract language should not sweep employee rights under the rug. All I'm getting at is in those cases, there were strikes, there were employers refusing to retire. We don't have any of that in this case. We don't. It was a one-day hearing. I don't know what I mean is you didn't preserve any objection before the board of the ALJ. I think the pages are 27 and 28 in the appendix. Your discussion with the ALJ. Right. And on line 11, or 1011, your explanation for what you want was, I would like to just have this question answered and move on. This doesn't sound like you're trying to introduce evidence. Nova, if that's your statement, and then the ALJ allows you to ask the question and for your client to give the answer. That's all on page 28. On page 27, I asked a question about representation. On page 28, Judge Moll said the argument in terms of the relationship is based on the contract language. And here's your response on page 28, line 10. Do you see it? Yes. It doesn't say. It doesn't sound like you want to put in evidence. You tell the ALJ, quote, I would like to just have this question answered and move on. End quote. And Judge Moll agreed. Okay, answer the question and then move on. So he agreed with what you wanted to do. We certainly did discuss it with the judge earlier. And then in terms of... You agree. Are you saying the transcript is incorrect? I'm not saying the transcript is incorrect, but we certainly did discuss it with the judge. Where? It came up again with Robert Blackwell. We tried to go into the issue of the union support and what had been done on that front. Where is that? Let's see. Mr. Blackwell starts day 44. Direct examination. On 45, you say, did employees talk to you about the union? Very little objection. Right. And then you say, I'll rephrase. I'll stand on the record as... All right. Well, on appeal, do you agree that you haven't proffered anything to this court, that you were prevented from introducing to show that the union did not hold majority status? I would... I believe that the language from the testimony of Kent Stringer... Not to my knowledge. Not to my knowledge goes to that point. And there has been no evidence of majority support otherwise presented. Well, I guess I take your position that the contract language alone is not enough. Although, don't we have more than that here? You have contract language and then you have, I forget whether it's 15 or 20 years, of an employer signing documents. That's an external act by the employer affirming that I have this status. There have been a number of Section 8F agreements signed as a series... No, no. The agreements actually say 9A, which is different than NOVA. And then the NLRB and the union differ in terms of when 9A obligation is allegedly attached. So the fact that these agreements continue to be signed tells me that it is an 8F agreement. And the fact... It may tell you that, but you have the burden to present evidence to the board, don't you? I don't believe we have any burden at all. So you can just cite NOVA plumbing and sit down? No, I don't think it's that easy either. I think we have to sit... We have to look at the agreement, we have to interpret the agreement. The National Labor Relations Board would say that meets Staunton fuel standards, but we don't believe Staunton is valid in light of this Court's precedent. This is the portion of... You don't have to interpret anything. This is the portion of NOVA that I take it you rely on. It says that the record contains no evidence of independent verification of employee support. This lack of evidence is fatal. Yes. And then by neither introducing such proof nor explaining its absence, the board and the union have failed to demonstrate an authority representation. Exactly. All that's left is the contract, and that's not good enough. The contract is not good enough because otherwise it would invite employers and unions to collude and strip away employees' right of choice. There's been no yes, no no in this case for employees. What evidence is there of that? I mean, you may be correct, but what evidence is there? The burden is on the union to present that and the board, and there was no such evidence. So this Court has been clear, and that's what I tried to get you to focus on. Garment workers, that's the Supreme Court. NOVA plumbing, M&M, and allied mechanical. All of those cases, there's some evidence that the union does not represent a majority of employees, and that was sufficient to overcome the general counsel showing to the contract. In allied mechanical? So if I'm a union person, any time I enter into an agreement in the construction industry, I have to force upon the employer proof, even though the employer says I've independently verified this and the union has proffered evidence of its majority support to me? What most unions are doing is incorporating language like that in their agreements, and they're hoping that employers will not litigate. If they litigate... But there's no proffer in this case of union support. The testimony of the owner was that he had no basis for, what was it, on 20... Not to my knowledge. Not to my knowledge. Not to my knowledge. That's correct. So unions are frequently inserting clauses like this, hoping that these cases resolve through settlement... But the client didn't say he was acting involuntarily when he signed all these agreements. My client signed the paperwork that was presented by the union, and it was when my client had advised the union well in advance that we are not going to be able to agree to the health plan, that there was any real movement toward negotiation. But you remember, the union filed a charge, and your client asked the union to withdraw the charge because he said he wanted to remain union. All right? My client asked the union to withdraw the charge and suggested they wanted to talk and achieve a different deal. And to remain union. And to remain union. That's correct. All right. Then they had some negotiating sessions. They could not reach agreement. The union filed a charge. Which was far more than six months beyond when the union was aware that my client intended to change the health plan. So the union's charge was untimely, and the ALJ properly noticed that. Okay. Shall we hear from counsel for the board? Yes. That will give you some time in rebuttal. Thank you. Okay. This is the court. Good morning. My name is Jeff Breyer. I'm here on behalf of the National Human Relations Court. Your Honors, as you pointed out, in 2005, the union offered a two-page assent agreement at deferred appendix 107 and 108, the first paragraph of which meets the requirements of the board's test in Stoughton Fuel. It states that the company verified the union's status as the majority representative of the employees, and critically, that the union offered to show confirmation of that majority status to the company. Now, under the board's Stoughton Fuel standard, that meets the – under the analysis of Stoughton Fuel, that meets the requirements of establishing a 9A relationship, despite the fact that this is a construction industry employer. Wait. If this were not a construction case, just a regular employer, your position is that language like that alone would be sufficient just to establish a union by voluntary recognition under 9A? Unfortunately, I can't answer that question. I'm not as – Doesn't the standard have to be the same? The point here is that essentially what's going on is a voluntary recognition by contract. That's right. And at a minimum, it would have to meet the 9A standard for voluntary recognition by contract. One might argue that even more, given the presumption in favor of continued ADAS status. So how can the board offer a test here that seems to be softer than what is required for voluntary recognition by contract under 9A? I'm sorry. I'm not suggesting that it would be softer. It's just whether or not, you know, given the facts and circumstances of a specific case, it's difficult to hypothesize. Isn't it the rule that the employer has to have a good faith belief in majority status? Even when presented with authorization cards, if the employer has a good faith doubt about the majority status, he's not required to recognize the union. Well, the employer is never required to recognize the union absent an election. Per agreement, they may do so. And so here – But it's even a stricter standard than good faith. I think good faith isn't enough. Right. In fact, the employer, under a 9A recognition, has to take reasonable measures to verify status for precisely the same reasons that have been talked about in garment workers and things like that. So it sounds like just saying contract language by itself wouldn't be enough in a 9A case. So how can it be enough in an 8F case when you actually have a presumption in favor of 8F status? Again, I'm not saying that it wouldn't be enough in a 9A case. Certainly, voluntary recognition based on agreement between the union and – How could this be enough if you have to have a reasonable effort by the employer under 9A? I should say, unfortunately, the precise standard in the non-construction industry standard for reaching a voluntary agreement is escaping me at the moment. So I'm not suggesting that it would be more than this. Well, let's assume it requires reasonable effort by the employer, or the employer bears the burden of making a mistake. Well, here, if the employer had every opportunity, the union offered it the opportunity as the employer agreed to in 2005, 2007, and 2009. I'm not sure we even have good faith here because we have the employer in 1991 verifying union status when it had no employees. So I'm not sure we even have good faith here. Your Honor, one thing is the critical distinction between the agreements that began in 1991 and continued until, I believe, 2003, if I'm not mistaken, and then the 2005 agreement, which is critically different because it was only in the 2005 agreement that the union – that includes language stating that the union offered to show proof or confirmation, I believe the language states, that it had the majority support of employees. That language was absent prior to that. So although you are correct that in 1991 there were no employees and yet there was this assertion, explicit assertion, that it was under 9A, that arguably – again, the board didn't assess this, but arguably that wouldn't have met Stanton's view because it lacked that critical third component of an offer to show proof. So the employer had the opportunity. I'm just trying to figure out why the union offering proof does anything to establish the reasonableness of the employer's verification. Well, because the employer doesn't have the ability to later claim that it didn't check on the offer of proof and it effectively turned its back in 2005 on the union's offer of proof to later utilize that as a defense once it desires to essentially get out of the obligations that it entered into in the agreement. So the offer of proof is sufficient. And I think the court has recommended that in Allied Mechanical that there are reasons why the union can't force the company to look at it, that the offer is sufficient and that the company doesn't take one bit. But that's totally inconsistent with Nova Plumbing. The recognition clause in Nova Plumbing wasn't an offer of proof. It said that the evidence was actually presented. Yes, sir. Based upon evidence presented to the contractor by the union, which evidence demonstrates the union represents majority, and we held that that contract language standing alone is insufficient. Well, you're right. How do you distinguish? I would distinguish, if I could offer a page citation, I would distinguish Nova Plumbing based on the language that appears on page 537 in which the court states it's under the request for having 7 and 8. I don't know if that helps you at all. But it's standing alone, contract language and intent cannot be dispositive, at least where, as here, the record contains strong indications that the parties had only a Section 8F relationship. So I understand the breadth of the rationale that the court offered. However, the holding of Nova Plumbing itself appears to be limited to the specific situation where there is countervailing evidence. And here, as there's been a good deal of discussion already, there was minimal and vast countervailing evidence. Now, I could take the opportunity to discuss what exactly occurred at the hearing. I think that's probably been addressed. I would like to, at the risk of taking kind of a belt and suspenders approach, I would also point out that any issue as to the judge's evidentiary rulings was not preserved in the company's opening brief. What do you do with the language on the preceding page? No, this argument is well taken. The proposition that contract language standing alone can establish the existence of a Section 9A relationship runs roughshod over the principles established in Garber's rules. Well, my response to that is two, and the first might be a bit frustrating in that, but I believe that the language here should be read in light of the facts at issue in that case, which is where, unfortunately, the Board did not consider the countervailing evidence and the Court granted the petition for review as a result and instructed the Board that it must consider that type of evidence even where there is contract language. So I think that… Would you agree that the only evidence we have in this case of union majority support is the contractual provision executed in 2005? That's the only… I mean, if we could break it down into kind of primary forms of evidence and secondary forms of evidence, which the Board doesn't do, just using that for the purposes of discussion. The primary source of evidence is the assent agreement. I would say, however, that there is other indications. There's indications that these union members, as well as Mr. Stringer, I believe himself the record establishes, obtained health insurance through the union's funds, that the employees continued to receive benefits in health insurance and pension and other wealth union funds for years. And there was no suggestion. There was no suggestion from Mr. Blackwell, who was in probably the best position of anyone to protect employee interests, as both somebody who testified before the hearing and filed amicus briefs before both the Board and this Court, and there was no assertion that there was any type of disaffection or strong indications of a lack of majority support as was present in NOVA. Now, I would also say that the Court's concern, obviously, or one of the Court's concerns, obviously, in NOVA Plumbing, is the opportunity for collusion between unions and employers, where, if I may, they're sitting at a conference table and decide the fate of their employees. However, we think that that's adequately addressed in the overall structure of the National Labor Relations Act. If we remember that the garment workers case was not a case along these lines where it was an 8F or 9A determination. It was a case on what was going on between the employer and the union. The employees here had the opportunity to file both... If they felt that the employer improperly recognized the union and if the union improperly accepted that recognition, the employees had the opportunity to file charges under 882 against the company. I'm not sure that argument works so well here, and that is because in the 8F context, subtract the pejorative nature of the term collusion, but the whole concept in the 8F starting point is collusion between the union and the employer without its pejorative nature. We are going to, in advance, tell the employees, this is your union and you have to join it, which may be why there's particular concerns about trying to transition to 9A in this context and why we have a presumption of 8F status. And the whole reason we have that special rule is that employees come and go, it can be a transient employment population, and so the notion that any particular group of employees is going to have the time and resources to file one of these challenges is, again, within the structure of the statute, not really, I think, a fair framing of what's going on in this context. So given that we start with actual hand-in-hand, joining of arms by the union and employer, forcing it on employees, then doesn't the need for sort of the 9A protections before you have voluntary recognition by contract apply with even greater force here? So it's not enough to say that there are jobs on collusion. There is. They're in it together. They've been in it together. They were in it together. You've written false representations about employees that didn't exist. Well, and now that the company has essentially engaged in that action, and now it's trying to use its own actions to escape the obligations that it entered into, the employees also have the opportunity. Well, the burden is on you and the union if you want this 9A. A lot of benefits come to unions from 9A status, but some burden has to come with it, and that burden seems particularly important when you're trying to transition from 8F to 9A because you don't have any front-end assurance of employee views, and, in fact, at the front end, employees are not relevant. Their views don't matter. At the front end, but at a certain point. At the 8F end. But at the 9A, they have to be determinative. They must be determinative, but the relationship certainly changes over time, and after a series of collective bargaining agreements or assent agreements and national agreements have been entered into, and there's no evidence suggesting there's anything but a stable workforce who are attaining these various benefits under the union's plan, there is no suggestion that the employees... This is a rule you want for all 8F to 9A transitions, and I assume you won't think Congress was wrong that one of the reasons we have the odd 8F construct is precisely because of the fluidity of workforces and the need to make advanced employer union agreements. That's clear from the 59.5 amendments that added 8F. Yes, I agree with that. Okay, so the facts of this case don't matter for the board's rule. We need to have the board's got a rule here. It doesn't have a small employer actually using a stable workforce exception, so... No, I know you're absolutely correct. Okay, so... But in continuing, my point was that there are various options that employees can take. They can certainly file unfair labor practice charges. They can seek the certification of the union. That's giving the union 9A benefits without the burden of proof to get that it's entitled to those. Well, I mean, we're talking about the burden of proof and what's sufficient, and when there's countervailing evidence, how that must be weighed. And this court has certainly instructed that the board may not ignore evidence of significant or substantial showing or indication of a lack of support. However, it is ultimately for the board to make these factual determinations, and when what they are confronted with, after hearing an opportunity to present evidence, is an agreement in which the company... It could not be more clear in the agreements that were signed about what the company was being offered. They were being offered, in 2005, in 2007, in 2010, the opportunity to review this majority support. And the board has made a determination that, again, absent something else that the company is able to show in order to respond to this. And, of course, the burden remains with the board. At best, there's no evidence here, one way or the other, right? Well, I mean, we'd have to define no evidence. I mean, no evidence outside the... As the court phrased it, any extrinsic evidence outside... Right, there's nothing other than contract language. That's right. All right, so this isn't like Milibon. It's not like the others where there was positive evidence. There's not negative evidence. There's not positive. There's no evidence. That's right. Well, there's a little more, and that's what I want to get at. The board has taken the position that it's not just contract language, but the board is willing to take the employer's word at face value that it has independently determined this. And as the board says in its fire case, there are various ways the employer could have done this, and there's no evidence that it wasn't done. So it's sort of inverting the burden, as it were. And I think that's, in the cases we've had to date, and as you point out in the Supreme Court case, there wasn't a close issue. All right? There was a lot of evidence on the record, and as we said in NOVA in stating our holdings, we said despite strong record evidence, the union may not have enjoyed majority support. In M&M, we came that same way. Then we come to Allies Mechanical. And in those cases, because of other things that have happened, this court was able to say, but in any event, the concerns that motivated NOVA plumbing as to the Section 7A rights don't exist here because we have evidence of the union authorization card. So now we have a case where we have a long-standing relationship between a union and an employer. We have language in the contract, and at least our court in Allies Mechanical has said there doesn't actually need to be a showing, but there has to be something to overcome sort of the presumption, which Judge Millett is getting at, is the board says to us we're sticking where we have been, where the general counsel makes a prima facie case, and while the union has the burden, the employer has to show that there's something wrong with this picture. It's not a good situation for the employee. So in this case, we have an employee who testifies, but he doesn't raise this point. So here, while it may be in a number of situations time-consuming and expensive for an employee to testify, here he testifies, but he didn't offer the evidence that would raise some question about this. So the board's saying, what? We're willing where there's contract language, there's an extended relationship over time, there's no showing of coercion, as it were, of the employer, there's no showing of coercion of the employee, other than beyond what Judge Millett was discussing with you is in the nature of the ADAPT relationship. I was just referring to your last point. I wasn't sure if you were done, but I think you're asking me if I agree. I agree with that in principle. The general counsel and the board has taken this position that this contract agreement, standing alone, with absent other evidence that the various parties have the opportunity to offer, as long as it meets these three requirements and is given the union has to offer the opportunity to review evidence of majority support and the company has to verify that it recognizes under 9A, then that is sufficient. I don't want to be overstating it. I don't know that the board, we don't know what the board would have found here had this relationship not dated back to 1991 or had there not been three rounds of agreements containing this adequate language. But just speculating here for the moment, suppose the employee had testified that there was this disgruntlement and that the union and the employer were not properly representing his rights, then what you see would have happened. The union would have had an opportunity to present evidence or what? Well, yes, the union would have had the opportunity to present evidence. Now, what the outcome would have been, that is something, the quantum of proof that would have satisfied the board is not something I can speculate on but if in this hypothetical, the issue had been raised and the union had either responded or declined to respond, what period of time is relevant here? Is it union support as of the date of the last agreement that was entered or are we going back to 2005? Well, you're saying 2005. 2005 was the time when the parties, or when the board found that the parties' agreement met the requirements of stunt and futile that triggered an IA relationship and correspondingly triggered the ongoing duty to bargain. I'm just trying to understand what the board, the board had said basically the employer had six months to challenge and if you don't challenge it, it's too late. But here, the union would have had to show its records, assuming it has them, back in 2005 over a decade ago as to what union authorization cards it had, for example. Well, that's an interesting question that is in debate, I believe, between the board and this court about what 10B requires in that context, not in the context of the challenge by the company. There's a Casali case that's discussed at the first page of the board's slip opinion and here the board found that it didn't need to determine whether or not the evidence dating back to 2005 could be considered under 10B because even if the board did consider it, it was insufficient. But I believe in Nova Plumbing that that is also called into question when you're talking about not an unfair labor practice but the formation of the agreement that is underlying the unfair labor practice with Nova Plumbing has come down and this court has come down in a different way about what would be appropriate to consider and I think Your Honor is correct under Nova Plumbing that in this circuit that type of evidence would be relevant and would not be time-barred. Again, I think that might be a different position from what the board has announced in the past but that wasn't an issue here. Is it reasonable for the board to rely on contract language about verification in a case like this where there are, I don't know how many agreements there were between 1991 and when they started having employees but that are objectively false? Well, it's unclear. I don't think I would be going out on a limb to acknowledge that the first one does seem to be objectively false given that there were no employees. Well, the owner was a worker. Well, the owner was a worker but there have to be two employees and whether he would be unlikely to qualify as a statutory employee under the Act. So it does seem like the first in 1991 it was not entirely accurate. Not entirely. You're talking about... I'm sorry. I shouldn't have qualified. Yeah, just that waffle here. Responsive weight on the employer verification and the employer verification is just objectively false in 1991 and I don't know when they started having enough employees to qualify for... I think it was a short time thereafter. I apologize for qualifying. You are, of course, correct. In 1991 there were no employees so there could be no verification of majority employee support for the union. That's correct. Now, how many of those afterwards? I can't say. I don't know if there was any determination on that. Then it's a spoiler point after that. Well, again, that may be the case. However, there was a significant change in that language in 2005. For the first time, I believe it was the last sentence of the opening paragraph of the agreement states that the union offered to show majority support. I'm trying to understand. I get why that was in there because of, I think, the sauna fuel test but I'm trying to get why that should matter for purposes of transitioning from 8F to 9A when we have to have... We know it's not enough for a union just to say that to get 9A anywhere. That there, at the minimum, has to be recognition for reasonable measures by the employer. And so I just don't know why that... You say it's significant. Can you explain to me why you think that is significant in establishing that the employer gets charged with duty? Well, I mean, if the employer believed that that was untrue, that the union would be unable to do that, the employer certainly would have the easy option of simply saying, show me the cards. And an inability to show the cards would end a statement that I'm not going to sign this 2005 assent agreement because I'm not going to... I being the company, the company would not be able to verify the majority status. The union was not able to actually deliver on its promise to offer the showing of majority support. And if that were the case, then they could negotiate this. The company certainly did not have to enter into that agreement or to make an assertion. Would you agree with the... Let me make a statement and tell me whether you agree with it. If ALJ recognized Millville Plumbing and set out the holding of Millville and then said, but I'm an ALJ for the National Labor Relations Board and despite Millville Plumbing, I have to follow the board's policy. Yes, sir. And then the case goes to the board. The board says, we adopt the reasoning of the ALJ and we're not going to change our precedent. It's not quite that circular, if that's the question of yours. No, no, no, no, no. I'm just... That is correct. That's what they said. But the board never tried to distinguish Millville Plumbing in its decision. Yeah, there's a footnote where it does. I think there is a footnote. I think there's a footnote and I believe in King's Fire, they also had a discussion of that. And that's where the board articulated what I had said much earlier in response to one of your earlier questions where there is a suggestion in the court's holding that setting aside for a moment the rationale of the court, that the holding is at least where here there's this type of evidence suggesting the lack of majorities. Oh, okay. And so it's kind of threading that line. All right, anything further? No, thank you, Your Honor. Well, I have one question on this. Sure, certainly. If we reach the second issue of timeliness. Yes, Your Honor. Where the board's opinion misstates the facts in the Ninth Circuit Peerless case. Yes, Your Honor. Does that require a remand? It was certainly regrettable that the board did this. I don't believe it requires a remand because Peerless was not an articulation of a new standard that was then misinterpreted by the board going forward. Peerless, it was a... I believe that what the board was doing was looking for a case that was very close on the facts and felt like it was a little bit closer than it actually was, unfortunately. However, Peerless is consistent with other decisions of the board. And in fact, the Ninth Circuit, two years later in American Distributing, reached the same holding in which they said that it's not the date of an announcement or the intention to engage in some action that would later turn into an unfair labor practice. It's actually engaging in the action itself and taking that unfair labor practice, which here arose at the earliest on May 15th and arguably well into June, which are both well within the 10-week period. I just want to understand what the argument would be that even though the board relied on Peerless and misstated the fact in Peerless as to whether or not there was notice, because it went further to say this is a well-established principle, CEG leached its own case in a slightly different factual context... I'm trying to understand, sort of under this cheddary notion, would a remand be useless? Because obviously the board would just... Not obviously, but I assume the board would just strike that subordinate clause and the opinion would basically remain the same. It may do that. It may find one of a number of other board decisions, some of which we cite in our brief, which stand for the same proposition. So I think we do cite a brief, a case in our brief, in which there was a misarticulation of the board's pretty well-known right-wing standard for discriminatory actions against union activities, and despite the fact that there was a... I don't know if misarticulation is a word, but a misarticulation of the standard that that wasn't fatal to the board's position because it was consonant with other board decisions... And no remand was necessary. Pardon me? And no remand was necessary. All right, thank you. Thank you. Thank you. Good morning, and may it please the court. I'm here to represent the union. My name is Bill Osborne. We're here to support the board's position that the decision should be enforced, and we believe that the evidence and the facts is even stronger than the board has argued. I'd like to start, with the court's permission, by trying to explain why this is not a Nova Plumbing case. Nova Plumbing was an initial agreement. It didn't cite a specific statutory basis for recognition. The language was ambiguous. Where that language is ambiguous, two things happen. First, there's a presumption that it's an AF agreement, as a matter of law. And second of all, extrinsic evidence becomes admissible. The extrinsic evidence in Nova Plumbing was strong, according to the panel. Strong, showing that there was no support for the union at the time. This case doesn't have one agreement. It has 14 agreements. Those agreements extend over 23 years. Each and every one of those agreements specifically identifies the basis for the party's recognition as Section 9A of the National Labor Relations Act. When the agreements start in 2005, that's saying that the union offered evidence to the employer. Right. Right? Can you tell me what evidence was offered? What evidence was offered? No, no. The contracts say that the union offered evidence. The record doesn't state one way or the other whether evidence was offered. I have no idea. No, the contract says that evidence was offered. I hear that. I just don't know, in fact, whether that was done or not done. The record is silent on that. Okay, so we don't even know whether, in fact, that proffer of evidence ever actually happened. No, but we do know that the law in this circuit and the Supreme Court and that the NLRB is an offer to show, and the employer's agreement that you did show is sufficient to support 9A recognition. Not by itself. Not in this circuit. I believe it is, Your Honor. It would require reasonable efforts by the employer, not just an offer. I wouldn't want to disagree with Your Honor as to what the law in the D.C. Circuit is, but my understanding is that Section 9A, Allied Mechanical, for example, applies to the construction industry to the same extent as it does outside the construction industry. 9A applies everywhere the same. These are 9A agreements. There are plenty of cases going back decades of the different kinds of showing or offers to show inside and outside the construction industry, which are found to support a 9A agreement. To get to a point that Judge Randolph made, how does ladies' garment workers work into this? Let's suppose in 2005 or 1991, a union went to an employer and said, I want you to sign this explicit 9A agreement. No ambiguity about it. We represent blah, blah, blah. The employer signed it. Within six months, ladies' garment workers leaves that agreement vulnerable to challenge. It's an unfair labor practice, and it invalidates the contract if there's no sufficient majority support for that 9A recognition. So to the extent that anyone thinks that we're contending that ILVW ladies' garment workers doesn't apply here, that's not true at all. If that's applied to the same extent, it applies in other 9A contexts. And it did apply in Noble Plotter. And there was an ambiguous contract. There was no 9A in that agreement, and the extrinsic evidence, which became admissible, disproved the contention, any contention that that was a 9A agreement. So this came to... Pardon me, sir? Under NOVA, who has the burden of proof? Is it the employer that must show lack of majority support, or is it the union board council that must show majority support? If I can answer it this way, first of all, we're in the construction industry, point one. Point two, where the language is unclear, as it was there, the burden is on the union and the employer to establish that it's not an ADEF agreement. That is, there's two ways, there's two parts to that, and this is what I think sometimes people misunderstand. But that's another way of saying that the burden is on the union and the employer or the board council to establish that there's majority support. No, there's two parts to this, and let me try and be more clear. First of all, where the contract's ambiguous, the moving party has to show that the party's intended a 9A agreement. And you can do that from language or external evidence. Once you establish, and this is something that I think is lost sometimes, once you establish a 9A agreement, that doesn't make it a valid 9A agreement. That means the party's intended 9A. Okay, but if they don't have the support, then it's an invalid 9A agreement. And our cases, the cases we cite in our brief show that if, suppose there was an invalid 9A agreement, says 9A, no employee support. That's an invalid 9A agreement, it can never be an ADEF agreement. ADEF on its face and board law going back to the 60s says, ADEF says if an invalid employer-supported agreement can never be an ADEF agreement. So the argument that... Say that once more so I'm clear. You're saying that if the employer and the union sign an agreement that says they have a 9A relationship... And it's collusive, right? And it's improper. Correct. Then the relationship between the two parties can never be an ADEF? That's what ADEF says and that's what the cases we cite say. ADEF says an employer-supported agreement cannot be an ADEF agreement. So that leaves the parties, what, to be negotiated? It leaves the parties with an unfair labor practice, an unlawful agreement, and an invalid agreement. And that doesn't ever... So when a company comes here and says, well, you know, there's not majority support for a 9A agreement, and therefore it's an ADEF agreement, that's a non-sequitur. This doesn't get there. And I'm not suggesting in this case... I'm sorry, what case says that? Excuse me, Your Honor. I'm sorry, what case says that? Pardon me? What case says that? I think it can't be... The cases are in our brief and the statute says that it's on its face. The statute says that. And, you know, unions are in the... We're in the business of protecting employee rights. I would never come here and ask the court to disregard ladies' garment workers. That's critical. But the employees never complained about it. This went on for 23 years, 14 agreements. No one complained about it until it came up as a lawyer's defense going on for a labor practice charge. And I guess that's... I'm running out of points I want to make, but I really want to answer your questions if you have any. Otherwise, I think I have a red light here. So in response to... So I'm clear. In response to the line of questions Judge Millett was pursuing earlier, your point is that in that six-month period, this 9A agreement is subject to being attacked and determined to be invalid. Absolutely. No question about it. And if it's determined to be invalid, collusive, or however you want to characterize it, it's illegal. It's not for a labor practice. But the point is that if the parties sign an agreement that says their relationship is a 9A agreement and there is no challenge to that assertion, and we're in the seventh month, eighth month, it is a valid 9A agreement, absent something else that we don't have here. Unless and until a de-cert is filed. Unless and until the employer files an RF petition. And that is Bryan Manufacturing. That's 1960s Supreme Court law reversing the D.C. Circuit, I might add. But that's Bryan Manufacturing. And if Bryan Manufacturing applies to the same extent in the construction industry as otherwise, where we have plainly a 9A agreement. If it's ambiguous, then we get to NOVA plumbing. You say, wait a minute, what is this? Well, we're in a situation where, let me ask by predicate, do you agree that prior to 2005 that this wasn't, or in 1991, did this start as an 8F relationship? No, it started as a 9A relationship. How could it do that when there's no employees? I don't know what happened back then. No, no, no, we do know. That's what the employer testified to. What I'm asking is does this framework that you want to embrace apply? Let's suppose. Can I finish this? Does this framework you want to embrace apply when the claim of 9A says, although I don't think it didn't say 9A in 1991. I don't think it said 9A in 1991. It did. It did. Where's that? It was explicitly a 9A agreement. Where's that language? Oh, no, I see it. You're right. You're absolutely right. Okay. So they claim it. I'm on J93. You're right about that. It's objectively false. It is objectively false. Well, let's suppose it is for our benefit. I'm not going to suppose. Do you have evidence that there was a vote? No, I'm saying that that's what the employer asserted. Let's suppose that that agreement was signed when there were no employees. The answer to your question, Judge, is in the construction industry and outside the construction industry, a premature grant of 9A recognition. They have one employee. They have no employees. In this situation, you're positive. It's an 8A2 violation in the construction industry and outside the construction industry. It cannot be an 8F agreement. Okay. But then so does this framework that you want to have that insulates the 9A when it isn't attached to the principles apply? Sure it does. What case would say that when you have something that, from the beginning, on its face is a false claim of 9A status as a matter of law and fact, that still requires someone to challenge it within six months when there's nobody to challenge it and there's all these protections attached? I take the six-month limitation. I don't have a case on hand. I have cases that that's an 8A2 violation and an 8B violation. I'm sure there are cases, and I have the right to submit them to the court afterwards, that say 10B applies, but it only applies when an employee is adversely affected. It doesn't apply in a vacuum. That is to say, let's suppose they sign an agreement on January 1 that says 9A and there's no basis for the 9A, so it would be an 8A2. The following November, three employees are walking in the office and they say, well, you're subject to a 9A agreement. They say, what? How did that happen? I don't hear about that. Then the six-month period would start to begin. I don't think there's any way to make those employees complain about a violation of their Section 7 rights until, A, they're employees and, B, they've been adversely affected. I can find those cases. I didn't research that. I'm sure that's true. Certainly, no one would argue, well, there's no way to remedy this because there were no employees. I don't want to try and convince anybody with that proposition. Thank you. What do we do with the small problem that this is not the rationale that the Board gave? I'm not disagreeing with the Board. I'm supporting the Board. The Board found a 9A. It's an entirely different argument. Well, I'm adding to the Board's argument. The Board said it was a 9A relationship as of 2005. We completely agree. There's no argument about that. What I'm saying is, in addition to that, there's 9A agreements going back to 1991, all of which are 9A agreements, all of which are expressed, none of which are ambiguous, and that supports the Board position. I understand there are limits to what an intervener is allowed to present, and I'm not changing the issues. I'm trying, at least, to get the Board's back on this, to say this case is even stronger, and this is not a normal plumbing case. This is not an initial agreement. This is not ambiguity, and there's no external evidence of anything. The best evidence in the case is amicus. Blackwell testifies. Was there any – did anybody argue, certainly the Board didn't say anything and the ALJ didn't say anything, that if this is an 8F agreement, then it's invalid? I'm sure we argued that it couldn't be an 8F agreement. It could only be a 9A agreement, but I don't believe that I heard that argument made, Your Honor. I'm not positive, but I don't believe that I did. I thought I heard an argument from you just now. Geez, I hope not. Let's backtrack. Maybe I could have misunderstood your question. We argued to the Board and to this Court that this is a 9A relationship, and has been for 20-some years, okay, and that it cannot be an 8F relationship because – and we cited the cases in there that breathe some place – it cannot be an 8F relationship because even if it was an unlawfully assisted 9A relationship, it would revert to an 8A2 violation, and that is precluded by 8F. So it can never be an 8F relationship, whatever else it might be, and whatever support may or may not have been there, whatever collusion. Did I answer your question that time, Judge? If it's a 9A – if it's not a 9A agreement, who cares what it is? The employees care what it is. The employer can walk away from it after the term expires, and that's the only issue in this case. No. There are all kinds of consequences and benefits to 9A. By the way, this is not a decisive fact, Judge. If it's not a Section 9A agreement, if it's an illegal 9A agreement, then who cares whether it reverts to an 8F? I mean, the term has expired and the employer can walk away. Well, there would be remedies. That would be a non-carlator practice, an interference with the employee's rights. There would be board proceedings. I mean, you don't impose. What rights attach to a non-9A, not anything else, agreement? If a 9A relationship was imposed unlawfully, the employee's rights under the statute are grossly violated, and we're not in the business – I'd like you to believe that we're not in the business of doing that. And by the way, this business about bargaining, you note that at the expiration of the most recent contract, the employer didn't say, oh, pre-hire agreement, I'm going home. They bargained and bargained and bargained. Everybody understood this was a bargaining 9A relationship until it got to the end for labor practice, Judge. And that's where we are.  You know, I just can't imagine that the board's decision, which we're supporting, isn't supported by overwhelming facts and law. And I'm happy to end my contribution. All right, thank you. Counsel for Petitioner? Thank you. Just a few comments. In regard to the issue of an objection to the limitation on evidence, I just don't want to point to page 28 where I did mention the ladies' garment workers. That was after an objection from counsel to the general counsel, and the judge limited me to one question, stating that the only issue was whether the contract language would be enough. All right, you limited yourself to that one question, because I read that page. I just have this one question I want to answer. That was you, not the ALJ. Judge Moll said it, so he can answer the question, but then I want to move on from there. I'm just repeating your words back to you. Yes, what's next? There was dialogue back and forth. We've got your point about citing ladies' garments. With regard to the rights of employees to challenge an improperly granted recognition under 9A, Section 882 charges or Section 8B1A charges against a union, those are complicated things. And the convenience of an 8F relationship is that an employer and a construction union can sign up any day of the week and begin a bargaining relationship, and the employees aren't necessarily going to know about that agreement or the technicalities of a relationship. You don't represent the employees. You're the employer, and so you signed it and your client knew what they were signing, and your client had six months later to go, wait, that says 9A, that's wrong, and did not meet that deadline. So on what basis does your client show up now 20 years after the fact and go, actually, it wasn't a valid 9A? The basis that the union treated this as an 8F, that they came to my client with a termination letter, a termination agreement that they sought to advise the client of withdrawal liability, assuming that the bargaining relationship came to an end, and that assumes the union was aware that there was an 8F relationship as well. Declawa, cited by the board and recognized by this court, presumes Section 8F relationships absent something more in the way of majority support. What does it take to trigger that presumption of an 8F relationship? Do you have to have an agreement that it's either silent or says 8F? You should be an employer in the construction industry, and if you sign an agreement, it's the fact that that agreement exists. Really? There's a presumption, even if the agreement says 9A all over, just because you're in the construction industry, it's presumed to be 8F anyhow? That's where the issues have arisen under board law, and we've had litigation here such as NOVA. But the Declawa presumption is that it's 8F, and the conduct of the union suggests that it was 8F by the manner in which they approached the company in terminating the agreement and advising them of withdrawal liability. I think while I do represent the employer, I think suggesting that the onus is now on the employees to understand and file Section 882 charges is honestly unrealistic. That's a different point from your client signing these agreements over all these years as 9A, and then when they didn't like it, said it's not 9A, 20 years after the six-month period for challenging 9A status expired. It's not so much that we didn't like this, but we wanted to talk about an agreement that would have a different health plan, and those negotiations frankly didn't go anywhere. But it's a different chemistry from, say, the Raymond Interior Systems case, where you have rival unions, and the union that lost out on the work understood that it could file a Section 882 charge to challenge a wrongful 9A recognition. This is putting a lot of burden on employees after they've lost the ability to choose whether to have representation. What do you say, if I understand counsel for the union, says, look, the question here is not whether this is an 8F agreement. The parties clearly intended it to be a 9A agreement, and the issue is whether this is a valid 9A agreement. I think that it's putting too much power in the hands of the union and the employer to make a choice for employees. Was that part of the general counsel's presentation or the union's presentation before the board, that argument? Not so explicitly. I took the argument from the board, the general counsel, as well as the union to be, this contract language is here, it must be true, therefore impose a 9A relationship and the intended obligations. The focus was not on whether it's 9A or 8F. I mean, the question was, it can't be 9A if they don't approve majority support. By that, I mean the general counsel and the union. That was certainly our view. With regard to the timeliness defense and whether the Casale case has any impact on this, I think, again, it's a question of bad policy to impose 10B on the creation of an unlawful 9A relationship because it, again, assumes that employees are going to know to challenge or it assumes that an employer is going to blow the whistle on itself. And that's very unlikely to happen. So those labor unions that will put into form agreements a 9A clause really stand to benefit from that sort of what I will refer to as boilerplate. Unless the court has any questions, I'll conclude my remarks. Thank you very much. Thank you. We'll take the case under advisement.
judges: Rogers, Millett, Randolph